IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

**JOHN L. McLEMORE, Trustee,**            )
                                          )
      **Plaintiff,**                )
                                          )
**v.**                                    )     **Case No. 3:08-cv-0021**
                                          )     **Judge Trauger**
**REGIONS BANK, as Successor in Interest** )
**by Merger to AMSOUTH BANK, and**        )
**MID-ATLANTIC CAPITAL CORPORATION,** )
                                          )
      **Defendants.**               )

---

**EFS, Inc.,** *et al.*,                  )
                                          )
      **Plaintiffs,**               )
                                          )
**v.**                                    )     **Case No. 3:08-cv-1003**
                                          )     **Judge Trauger**
**REGIONS BANK, as Successor in Interest** )
**by Merger to AMSOUTH BANK,**            )
                                          )
      **Defendant.**                )

## MEMORANDUM

       Pending before the court are two Motions for Judgment on the Pleadings filed by

defendant Regions Bank (Docket Nos. 106 and 108), plaintiff John McLemore's response

(Docket No. 116), plaintiff EFS, Inc.'s response (Docket No. 117), the defendant's replies

(Docket No.123 and 124), and the plaintiffs' joint surreply (Docket No. 134). Also pending is

the plaintiffs' joint Motion to Strike (Docket No. 112) and the defendant's response (Docket No.

114). For the reasons discussed below, the defendant's motion as to plaintiff McLemore will be

1

granted, the defendant's motion as to plaintiff EFS will be granted in part and denied in part, and the plaintiffs' motion will be denied.

## BACKGROUND

Barry Stokes owned and operated 1Point Solutions, LLC ("1Point"), which acted as a third-party administrator ("TPA") for various employee benefit plans, including 401(k) retirement plans.[1]  Stokes and 1Point held a number of fiduciary and personal accounts with defendant Regions Bank ("Regions").[2]  Over the course of several years, Stokes stole client money from the fiduciary accounts, and he and 1Point ultimately entered bankruptcy.  These two consolidated suits were brought by the bankruptcy trustee, John McLemore (the "Trustee"), and several former clients of 1Point (collectively, "the plaintiffs").

In addition to 401(k) plans, 1Point acted as TPA for other types of savings plans, which the plaintiffs refer to collectively as "cafeteria plans."  These included health savings accounts, flexible spending accounts, and dependent care accounts.  Generally speaking, these accounts held pre-tax funds that employees could spend on qualifying health- or childcare-related expenses.

TPAs usually provide record-keeping services and assist in transferring money.  The plaintiffs allege that most TPAs do not handle money or securities themselves.  1Point, however, opened numerous accounts at Regions to hold funds for its clients, including accounts titled

---

[1] Unless otherwise noted, the allegations are drawn from McLemore's Second Amended Complaint (Docket No. 99) and EFS' Second Amended Complaint (Docket No. 100).

[2] Stokes and 1Point's banking was actually done with AmSouth Bank ("AmSouth"), which merged with Regions.  AmSouth continues to operate as a division of Regions.  For simplicity, the court will refer to Regions and AmSouth collectively as "Regions."

"1Point 401(k)," "1Point FSA," "1Point FSA Depository Acct," "1Point HSA," and "1Point DCA." Stokes allegedly opened at least 58 accounts at Regions.

The plaintiffs allege that 1Point intended to set up separate accounts for each client, using the clients' tax identification numbers. Instead, Regions allegedly insisted that 1Point set up accounts under 1Point's own tax identification number, giving them names that referenced each individual client, such as "1Point FSA Metro Government Account." 1Point deposited nearly $6 million in 401(k) funds and $45 million in cafeteria plan funds with the defendant. When it ceased operations, 1Point was the TPA for 52 separate 401(k) plans.

Regions is subject to certain federal banking laws, including the Bank Secrecy Act. Regulations under that act, which impose a range of anti-money-laundering compliance requirements, are promulgated and enforced by the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). For example, banks are required to report large currency transactions and to file suspicious-activity reports when transactions appear to be designed to evade cash reporting regulations.

Banks are also required to establish procedures and systems to comply with FinCEN regulations, including automated computer monitoring of accounts. The plaintiffs allege that Regions failed to implement such systems. The Trustee has attached documents to his complaint showing that, in 2004, the Department of the Treasury found that, during the previous four years, Regions' predecessor, AmSouth, failed to: (1) implement policies sufficient to capture suspicious account activity; (2) report suspicious activity in a timely manner because of these systemic deficiencies; and (3) respond to instances of accounts being used for embezzlement and

3

fraud. (Docket No. 99, Exs. 1-4.) AmSouth was fined $10 million for these violations, and it agreed to pay an additional $40 million under a Deferred Prosecution Agreement with the U.S. Attorney's Office. The plaintiffs allege that Regions failed to remedy these violations in 2005 and 2006.

According to the plaintiffs, Stokes' and 1Point's account activity was unusual and should have "triggered red flags under FinCEN law and guidance," which in turn should have alerted Regions to its duty to investigate the transactions further. (Docket No. 99 ¶ 45.) For example, Stokes withdrew hundreds of thousands of dollars from the 1Point 401(k) account in cashier's checks made payable to himself. He frequently transferred money among 1Point's and his own accounts, and various accounts were often overdrawn. The plaintiffs allege that Stokes used money in 1Point's accounts to pay for operating and personal expenses and that Regions withdrew its fees from 1Point's trust accounts.

Among other things, the plaintiffs allege that Regions "knew or should have known":

(1) that 1Point was a TPA holding funds for the benefit of 401(k) plans and cafeteria plans;

(2) "that Stokes was withdrawing large sums of money in transactions which individually do not require a Currency Transaction Report, but taken together, do reach such levels";

(3) "that Stokes was using cashier's checks and other transfers to withdraw substantial amounts of money from fiduciary accounts for his personal benefit";

(4) "that Stokes was using wire transactions to send money from fiduciary accounts to accounts which were not related to the fiduciary business of the accounts";

(5) "that Stokes was conducting a large number of transactions in even dollar amounts," many of which "appear to have been structured to avoid the currency transfer reporting laws";

4

(6) "that the transactions in its accounts were not consistent with the TPA business of 1Point";

(7) "that there was an unreasonably high volume of wire transfers and cashier's checks, in connection with frequently overdrawn accounts"; and

(8) "that it was allowing fiduciary accounts to be commingled and overdrawn."

(Docket No. 99 at ¶¶ 53-66; *see also* Docket No. 100 ¶¶ 61-74.)

The plaintiffs allege that 1Point moved its accounts to Fifth Third Bank in early 2006, but that the bank soon closed most of the accounts for improper activity. 1Point then returned its accounts to Regions. 1Point ceased operations and entered bankruptcy in September 2006.

This suit was initially filed in bankruptcy court by the Trustee against Regions and Mid Atlantic Capital Corporation ("MACC") for their alleged fault in allowing Stokes' wrongdoing.[3] On February 11, 2008, this court withdrew the reference of that case to the bankruptcy court. (Docket No. 7.) Regions filed a Motion to Dismiss, and, in a memorandum dated September 9, 2008, this court found that: (1) the Employee Retirement Income Security Act ("ERISA") gave the Trustee standing to pursue his claims on behalf of the plans; (2) Regions was not a fiduciary under ERISA; (3) the Trustee's non-fiduciary ERISA claim against Regions should be dismissed; (4) ERISA preempted the Trustee's state-law claim that Regions aided and abetted Stokes' and 1Point's breach of fiduciary duty; and (5) the Trustee's state-law negligence claim could go forward. (Docket No. 33.)

On December 9, 2008, the Trustee's case was consolidated with an effectively identical suit filed by EFS, Inc., a former client of 1Point, and other former 1Point clients (collectively,

---

[3] MACC has since been voluntarily dismissed from the suit. (Docket No. 62.)

"EFS"). (Case No. 3:08-cv-1003, Docket No. 17.) On November 18, 2009, the Trustee filed a Second Amended Complaint, asserting claims for negligence and recklessness, unjust enrichment, and violation of the Tennessee Consumer Protection Act. (Docket No. 99.) On November 25, 2009, EFS filed its own Second Amended Complaint, asserting identical claims.[4] (Docket No. 100.)

## ANALYSIS

The defendant has filed two Motions for Judgment on the Pleadings, pursuant to Federal Rule of Civil Procedure 12(c), arguing that all claims should be dismissed. The plaintiffs have filed a joint Motion to Strike Defendant's Affirmative Defenses of Comparative Negligence or, in the Alternative, for More Definite Statement of Defenses, pursuant to Rule 12(f).

## I.      Motion for Judgment on the Pleadings Standard

The court approaches a Rule 12(c) motion for judgment on the pleadings the same way it approaches a Rule 12(b)(6) motion to dismiss. *Jelovsek v. Bredesen*, 545 F.3d 431, 435 (6th Cir. 2008). The Federal Rules of Civil Procedure require a plaintiff to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed R. Civ. P. 8(a)(2). In deciding a motion to dismiss under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff . . . and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The court must assume that all of the plaintiff's factual

---

[4] EFS' Second Amended Complaint also states three aiding-and-abetting claims. EFS concedes that, in accordance with the court's previous dismissal of the Trustee's aiding-and-abetting claims, these should be dismissed. (Docket No. 117 at 2.)

6

allegations are true, even if they are doubtful in fact. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In contrast, legal conclusions are not entitled to the assumption of truth. *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1950 (2009).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). The factual allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949-50.

## II.     Negligence Claims

### A.        The UFA and the Duty Owed by Regions

The defendant argues that the plaintiffs' negligence claims must fail because it did not owe a duty to 1Point's clients and because the Uniform Fiduciaries Act immunizes its conduct.

The parties spend many pages of their briefs arguing over the duty that banks owe to non-customers, or to a fiduciary depositor's principals. (*See* Docket No. 116 at 9-14; Docket No. 117 at 6-18.) The plaintiffs' arguments focus on broad principles of negligence law, which generally state that the existence of a duty of care is based on the foreseeability of harm. *See, e.g.*, *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 365 (Tenn. 2009) ("In order to determine whether a duty is owed in a particular circumstance, courts must first establish that the risk is foreseeable . . . .").

But these general principles are irrelevant to this case, because Tennessee has adopted the Uniform Fiduciaries Act ("UFA"), which governs a bank's liability for the actions of a fiduciary depositor. Specifically, the act explains the contours of liability to a fiduciary's

7

principals when the fiduciary transfers funds to his or her own personal account:[5]

> If a fiduciary makes a deposit in a bank or savings institution to the fiduciary's personal credit of checks drawn by the fiduciary upon an account in the fiduciary's own name as fiduciary, . . . or if the fiduciary otherwise makes a deposit of funds held by the fiduciary as fiduciary, the bank or savings institution receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of the obligation as fiduciary. The bank or savings institution is authorized to pay the amount of the deposit . . . upon the personal check of the fiduciary without being liable to the principal unless the bank or savings institution receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of the obligation as fiduciary in making such deposit or in drawing such check or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.

Tenn. Code Ann. § 35-2-109.

A similarly worded section governs withdrawals by the fiduciary from an account containing fiduciary funds:

> If a deposit is made in a bank or savings institution to the credit of a fiduciary as such, the bank or savings institution is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank or savings institution pays the check with actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith.

---

[5] Although the relevant sections of the UFA are phrased in terms of checks written or deposited by the fiduciary, the act applies equally to withdrawals and intra-bank transfers. *See Chambers v. First Trust & Sav. Bank*, No. 030A1-9108-CH-00293, 1992 Tenn. App. LEXIS 231, at *8 (Tenn. Ct. App. Mar. 4, 1992) (applying the UFA and noting that the transactions at issue "were not by check but by non-negotiable in-bank withdrawal slip transactions"); *Rheinberger v. First Nat'l Bank*, 150 N.W.2d 37, 41 (Minn. 1967) (applying the UFA to intra-bank transfers). The parties do not argue otherwise.

8

*Id.* § 35-2-107.

These provisions are bolstered by an amendment, passed by the Tennessee legislature in 1993, clarifying that a bank does not acquire any duty simply because it knows that a depositor is a fiduciary. Furthermore, a bank generally has no duty to limit a fiduciary's transactions:[6]

> (1) Knowledge on the part of the bank or savings institution of the existence of a fiduciary relationship or the terms of the relationship shall not impose any duty or liability on the bank or savings institution for any action of the fiduciary.

> (2) A bank or savings institution has no duty to establish an account for a fiduciary or to limit transactions in an account so established unless, in its discretion, it contracts in writing with the fiduciary to establish or limit transactions with respect to such an account . . . .

*Id.* § 35-2-111(c)(1)-(2).

The Tennessee Court of Appeals recently explained the purpose of the UFA:

> The UFA was designed to facilitate banking transactions by relieving depositary banks of the responsibility of assuring that an authorized fiduciary used entrusted funds for proper purposes. It is based on the assumption that a fiduciary will properly apply funds entrusted to him or her, and it places the burden on the principal to employ honest fiduciaries. It also specifically rejects the idea that negligence on the part of a third person dealing with a fiduciary is sufficient to shift the risk of fiduciary misconduct from the principal to the third party.

*C-Wood Lumber Co. v. Wayne County Bank*, 233 S.W.3d 263, 274 (Tenn. Ct. App. 2007) (citations omitted).

---

[6] The Trustee argues that this provision does not apply to Regions, because section 35-2-111(a) states: "This chapter is applicable to state and federal savings and loan associations and savings banks." (Docket No. 116 at 2-3.) But section 35-2-111(c) explicitly applies to "banks," which is defined by section 35-2-102(a)(1) to include any association "carrying on the business of banking." This definition clearly includes Regions and its predecessor, AmSouth.

9

As an initial matter, the court rejects the defendant's apparent argument that section 35-2-111(c) completely immunizes banks from all liability, in any circumstances, arising from a fiduciary's actions. (Docket No. 107 at 8-9.) If this were true, that section would implicitly repeal sections 35-2-107 and 35-2-109, which allow liability if a bank has actual knowledge that a fiduciary is breaching his or her duty. Nothing in section 35-2-111(c)(1) forecloses such liability. Instead, it merely states that a bank's knowledge "of the existence of a fiduciary relationship or the terms of the relationship," by itself, does not create liability. Because this does not speak to situations where a bank has acted in bad faith or with knowledge of a fiduciary's wrongdoing, these sections of the UFA can be reconciled. In Tennessee, repeal by implication is disfavored and occurs only when a later statute cannot be construed harmoniously with an earlier statute. *C-Wood Lumber*, 233 S.W.3d at 278.

Taken together, these provisions make it clear that a bank is liable to a principal for a fiduciary's illegal withdrawal or transfer of funds if, and only if, the bank had "actual knowledge" that the fiduciary was breaching his or her fiduciary duty or had "knowledge of such facts that its action . . . amounts to bad faith." Tenn. Code Ann. §§ 35-2-107, 35-2-109. Anything less is insufficient to support liability.

**B.    Bad Faith**

The UFA does not define "bad faith," although it does define "good faith": "A thing is done 'in good faith,' within the meaning of this chapter, when it is in fact done honestly, whether it is done negligently or not." *Id.* § 35-2-102(b). The obvious implication is that a bad-faith act is done dishonestly.

Only a handful of Tennessee courts have addressed the meaning of "bad faith." In

10

*McConnico v. Third National Bank*, 499 S.W.2d 874 (Tenn. 1973), the court, although primarily

discussing "bad faith" under the Uniform Commercial Code, equated bad faith with dishonesty.[7]

*Id.* at 881-82 (discussing Tenn. Code Ann. § 35-2-109, which was then numbered section 35-

210, and holding that "there is no showing of such conduct as would evidence dishonesty and

consequently such bad faith under the [UCC] statute"); *see also C-Wood Lumber*, 233 S.W.3d at

284 (noting that, under the UFA, a plaintiff must "prove[] that the bank was acting dishonestly").

The Tennessee Court of Appeals has characterized the UFA as requiring "circumstances [that]

put the bank on notice that the fiduciary is misappropriating funds or intends to misappropriate

funds." *Chambers v. First Trust & Sav. Bank*, No. 030A1-9108-CH-00293, 1992 Tenn. App.

LEXIS 231, at *8 (Tenn. Ct. App. Mar. 4, 1992).

In *Chambers*, a court-appointed guardian held money in trust for three minors, and the

defendant bank's president signed a document acknowledging a court order that forbade non-

emergency withdrawals without the court's permission. *Id.* at *6-7, 9. The guardian depleted

the accounts by making regular withdrawals over the course of five months. The court found

that, by failing to investigate the withdrawals, the bank was acting in bad faith, because it "knew

that the court's order specifically forbade withdrawal of funds." *Id.* at *9. Thus, the court

premised its determination of bad faith on the bank's knowledge of the circumstances

surrounding the guardian's breach of her fiduciary duty.

In applying the UFA, courts in other jurisdictions have consistently held that a bank acts

---

[7] More recently, the Tennessee Supreme Court has clarified that, under the UCC, bad faith "encompasses a wider range of actions than outright deception or untruthfulness" and can include "a knowing or reckless disregard of a customer's rights." *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546, 549-50 (Tenn. 1996).

11

in bad faith if "the facts and circumstances [surrounding the fiduciary's breach] are so cogent and obvious that to remain passive would amount to deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction."[8]  *Richards v. Platte Valley Bank*, 866 F.2d 1576, 1583 (10th Cir. 1989) (applying Colorado law); *see also UNR-Rohn v. Summit Bank*, 687 N.E.2d 235, 239 (Ind. Ct. App. 1997); *Master Chemical Corp. v. Inkrott*, 563 N.E.2d 26, 31 (Ohio 1990); *Edwards v. Nw. Bank*, 250 S.E.2d 651, 656-657 (N.C. Ct. App. 1979); *Gen. Ins. Co. of Am. v. Commerce Bank of St. Charles*, 505 S.W. 2d 454, 458 (Mo. Ct. App. 1974)).  In other words, whether a bank has acted in bad faith turns on whether it knew facts that were sufficiently suggestive of the fiduciary depositor's breach of duty.[9]

---

[8] In assessing bad faith, some courts, including the Sixth Circuit, have found it relevant whether the bank's actions are "commercially unjustifiable."  *E.g.*, *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 834 (6th Cir. 1997) ("Thus, in determining whether [the defendant] acted in bad faith, the trier of fact would have to determine whether [the defendant's] actions were 'commercially unjustifiable.'") (applying Ohio law and citing to the UFA to explain "good faith" under the UCC); *Crawford Supply Group, Inc. v. LaSalle Bank, N.A.*, No. 09 C 2513, 2010 U.S. Dist. LEXIS 4691, at *22-23 (N.D. Ill. Jan. 21, 2010) ("When determining whether bad faith exists, courts consider whether it is 'commercially unjustifiable for the payee to disregard and refuse to learn facts [that are] readily available.'").  Nevertheless, the touchstone of the bad faith inquiry is whether the facts known to the bank sufficiently suggest a breach by the fiduciary.

[9] Numerous other courts have used similar formulations.  *E.g.*, *Watson Coatings, Inc. v. Am. Express Travel Related Servs.*, 436 F.3d 1036, 1041 (8th Cir. 2006) ("Where circumstances suggestive of the fiduciary's breach become sufficiently obvious it is 'bad faith' to remain passive.") (citation omitted) (applying Missouri law); *N.J. Title Ins. Co. v. Caputo*, 748 A.2d 507, 514 (N.J. 2000) ("[B]ad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary. . . . [W]here facts suggesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge."); *Appley v. West*, 832 F.2d 1021, 1031 (7th Cir. 1987) ("At some point, obvious circumstances become so cogent that it is 'bad faith' to remain passive.") (citation omitted) (applying Illinois law); *Minnesota Valley Country Club, Inc. v. Gill*, 356 N.W.2d 356, 362 (Minn. Ct. App. 1984) (finding bad faith where the bank's representatives knew that a fiduciary's "use of the money was a breach of his duty");

12

This requires more than a showing that the bank was negligent. *C-Wood Lumber*, 233 S.W.3d at 274; *see also O'Neal v. Southwest Mo. Bank (In re Broadview Lumber Co.)*, 118 F.3d 1246, 1251 (8th Cir. 1997) ("'Bad faith' requires something more than mere negligence and can be found where the [bank] disregards circumstances that are suggestive of a breach and are sufficiently obvious such that it is in bad faith to remain passive.") (applying Missouri law). As the Supreme Court of Pennsylvania has explained, negligence does not negate a bank's good faith:

> Even a failure to inquire under suspicious circumstances will not negate "good faith," unless the failure to do so is due to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction. Conversely, if a bank has knowledge that a fiduciary intends to appropriate trust funds to his own use, and that to release funds to him will aid a breach of trust, then the bank will be held to have acted in "bad faith."

*Robinson Protective Alarm Co. v. Bolger & Picker*, 516 A.2d 299, 304 (Pa. 1986) (citations omitted), *quoted in In re Mushroom Transp. Co.*, 382 F.3d 325, 344 (3d Cir. 2004).

Thus, to show that the defendant had "knowledge of such facts that its action . . . amounts to bad faith," Tenn. Code Ann. §§ 35-2-107, 35-2-109, the plaintiffs must show that the circumstances surrounding Stokes' and 1Point's transactions so clearly suggested a breach of fiduciary duty that Regions' failure to investigate was a conscious effort to avoid knowledge of Stokes' wrongdoing. The plaintiffs cannot merely show that the defendant was negligent in not

---

*Guaranty Bank & Trust Co. v. C & R Dev. Co.*, 258 So. 2d 543, 547 (La. 1972) (finding bad faith when "[t]he bank had before it clear evidence of a probable misappropriation"); *Peoples Nat'l Bank v. Guier*, 145 S.W.2d 1042, 1047 (Ky. 1940) ("The circumstances and conditions may be so cogent and obvious that to remain passive amounts to bad faith.") (citation omitted).

discovering Stokes' fraud or not undertaking reasonable efforts to monitor its depositors.

The plaintiffs have, in fact, alleged that Regions knew that Stokes was breaching his fiduciary duty by withdrawing money from fiduciary accounts and using it for his own personal benefit. They have also alleged facts suggesting that Regions acted in bad faith. Thus, their claims are valid under the UFA.

### C.    Preemption

The defendant further argues that, because the plaintiffs' negligence claims are limited by the UFA to claims of knowing or bad-faith conduct, those claims are preempted by ERISA.[10] (Docket No. 123 at 16-18.)

Previously, the court found that the Trustee's aiding-and-abetting claim against Regions were preempted by ERISA, while his negligence claim was not. It is instructive to reproduce the relevant section of the court's September 9, 2008 memorandum. After reviewing the relevant case law, the court wrote:

> A. *Aiding and Abetting Claims* . . .
>
> [T]he Trustee alleges that the defendants were aware of the fraud perpetuated by Stokes and 1Point and failed to act on this knowledge, and that the defendants knowingly participated in this fiduciary breach.
>
> The defendants claim that the Trustee's aiding and abetting claims, though framed as state law causes of action, essentially seek redress for breach of fiduciary duty under ERISA, in that they are "derivative of, and inseparable from" the plans' ERISA claims against Stokes and 1Point and would require this court to make a

---

[10] Because mere negligence cannot support liability under the UFA, it is not technically correct to call the surviving claims "negligence" claims. Regardless, for simplicity, the court will refer to them as such.

14

determination as to whether Stokes and 1Point breached their duties to the plans. To establish an aiding and abetting claim under Tennessee law, *a plaintiff must demonstrate that a defendant knew that the primary tortfeasor's conduct constituted a breach of duty* and that the defendant provided substantial assistance or encouragement of that conduct. Although the Trustee's aiding and abetting claims involved some wrongdoing on the part of the defendants, they nevertheless are derivative of the plans' ERISA claims to the extent that they are *fundamentally premised on this conduct of Stokes and 1Point and as their adjudication will necessitate the court's consideration of whether this conduct constituted a breach of duty of which the defendants were aware*.

Additionally, as Stokes and 1Point appear to have been fiduciaries under ERISA and, therefore, were traditional ERISA plan entities, adjudication of the Trustee's aiding and abetting claims would necessarily involve a resolution of issues pertaining to Stokes' relationship with the affected ERISA plans and his activities with respect to . . . those plans' assets, all of which is governed by ERISA. . . .

It is also noteworthy that ERISA provides that non-fiduciaries, such as the defendants here, may be subject to liability for knowingly participating in a fiduciary's violation of ERISA. Therefore, to the extent that the Trustee's aiding and abetting claims *essentially constitute an allegation that the defendants participated in the fiduciary breach of Stokes and 1Point*, ERISA provides the sole remedy for such actions, and the Trustee's aiding and abetting claims are additionally preempted for this reason.

As the Trustee's aiding and abetting claims implicate the relationships among traditional ERISA plan entities and as they constitute an alternate means for the Trustee to pursue a remedy for what is, at its core, an ERISA claim, these claims are preempted.

*B. Negligence Claims*

With respect to the negligence claims, however, the Trustee has a much stronger argument against preemption. Courts in the Sixth Circuit have permitted claims against nonfiduciaries for negligence, fraud, and other common law causes of action to proceed.

15

> Unlike the aiding and abetting claims asserted by the Trustee, adjudication of the negligence claims *does not require any inquiry into the duties imposed on Stokes and 1Point by ERISA or whether their conduct constituted a breach of those duties*. Instead, the negligence claims arise independently out of the defendants' conduct and involve only the defendants' actions *vis a vis* the plans. As such, these claims are not preempted by ERISA.

(Docket No. 33 at 32-35 (emphasis added and citations and footnotes omitted).)

Thus, the Trustee's negligence claim was not preempted because it "[did] not require any inquiry into the duties imposed on Stokes and 1Point by ERISA or whether their conduct constituted a breach of those duties." (*Id.* at 35.) This stood in contrast to the preempted aiding-and-abetting claim, which was "fundamentally premised on [the] conduct of Stokes and 1Point" and would "necessitate the court's consideration of whether their conduct constituted a breach of duty of which the defendant[] [was] aware." (*Id.* at 33.) The main reason that the Trustee's aiding-and-abetting claim was preempted was because it required him to show "that [the] defendant knew that [Stokes'] conduct constituted a breach of duty." (*Id.*)

The plaintiffs' surviving negligence claims are identical to the preempted aiding-and-abetting claims in this key respect. As explained above, the plaintiffs must show either (1) that Regions acted with knowledge of Stokes' and 1Point's breach of fiduciary duty, or (2) that Regions acted in bad faith because it knew facts that were obviously suggestive of their breach. Like the aiding-and-abetting claims, these claims are "derivative of the plans' ERISA claims," (*id.* at 33), because they necessarily require an examination of whether, and how, Stokes and 1Point breached their fiduciary duty. As with the preempted claims, the plaintiffs effectively "must demonstrate that [the] defendant knew that [Stokes' and 1Point's] conduct constituted a

16

breach of duty."[11]  (*Id.*)  The plaintiffs have once again "essentially . . . alleg[ed] that the defendant[] participated in the fiduciary breach of Stokes and 1Point," (*id.* at 34), by consciously remaining passive in the face of Stokes' bad acts.  Unlike the negligence claim that the court allowed to go forward, these claims do not "arise independently out of the defendant['s] conduct" and do not "involve only the defendant['s] actions *vis a vis* the plan."  (*Id.* at 35.)

Indeed, in support of his contention that the defendant acted in bad faith, the Trustee points to allegations in his complaint that Regions "knew or should have known" that Stokes was conducting transactions that breached his fiduciary duty.  (Docket No. 116 at 4-6.)  Similarly, EFS argues that "the facts alleged by plaintiffs support an assertion that Regions had actual knowledge of wrongdoing."  (Docket No. 117 at 6.)  When the court previously allowed the Trustee's negligence claim to go forward, it did not contemplate that the claim would require proof of the defendant's knowledge of Stokes' fiduciary breach.

The plaintiffs cite *As You Sow v. AIG Financial Advisors, Inc.*, 584 F. Supp. 2d 1034 (M.D. Tenn. 2008), and *Colbert & Winstead, PC v. AIG Fin. Advisors, Inc.*, No. 3:07-1117, 2008 U.S. Dist. LEXIS 53179 (M.D. Tenn. July 8, 2008), as examples of cases in which negligence claims were not preempted.  Both cases were brought by Stokes' former clients against the securities firms for which Stokes was a registered securities representative and investment

_____

[11] The plaintiffs argue that, because Stokes is now serving a sentence in a federal prison, it is undisputed that he stole his client's money.  Thus, it will not be necessary to determine whether he violated his ERISA duties.  (Docket No. 134 at 3-4.)  But this argument misses the point.  The aiding-and-abetting claim was not preempted because it was difficult to show that Stokes breached his fiduciary duty, or because his breach was contested by the parties.  The claim was preempted because it was "fundamentally premised on [the] conduct of Stokes and 1Point."  (Docket No. 33 at 33.)  It is irrelevant whether that conduct is undisputed.

advisor.  The plaintiffs alleged that the defendants were negligent in supervising Stokes.  584 F. Supp. 2d at 1037-38, 1049; 2008 U.S. Dist. LEXIS 53179 at *5.  Both courts found that the negligence claims were not preempted, for largely the same reasons that this court previously allowed the Trustee's negligence claim to go forward.

But as described above, the surviving claims here are not for mere negligence.  They are instead premised on Regions' knowing or bad-faith conduct.  The claims in *As You Sow* and *Colbert & Winstead* did *not* depend on the defendants having knowledge of Stokes' fiduciary breach.  In other words, the claims here are not merely "'based on the defendant['s] common law duty'" to monitor depositors' activity; instead, they are "'based on [the fiduciary's] behavior,'" *Colbert & Winstead*, 2008 U.S. Dist. LEXIS 53179 at *13 (quoting *Coldesina v. Estate of Simper*, 407 F.3d 1126, 1138 (10th Cir. 2005)), because they depend on Regions' knowledge of Stokes' breach.  Thus, they are preempted by ERISA.

The plaintiffs point out that three of the EFS plaintiffs are suing regarding plans that are not covered by ERISA.  (Docket No. 134 at 5-6.)  Specifically, they argue that plaintiffs Deborah Niedermeyer, Brian Allen, and James Simpson hold individual 401(k) and retirement plans that are not "employee benefit plans" for the purposes of Title I of ERISA,[12] which contains the act's

---

[12] It appears to the court that a fourth plaintiff, Gonzales County Hospital District ("GCHD"), may also fall outside of ERISA's scope.  The EFS complaint alleges that GCHD "is a governmental entity" and that its 401(k) plan was "established for the benefit of the hospital's employees."  (Docket No. 100 ¶ 4.)  ERISA Title I does not apply to "governmental plans."  29 U.S.C. § 1003(b)(1); *see also id.* § 1002(32) (defining "governmental plan").

The plaintiffs, however, do not specifically mention GCHD in their surreply.  If the plaintiffs wish to argue that GCHD's claims are not preempted because ERISA Title I does not apply to its benefit plan, they may file a Motion to Reconsider regarding GCHD.

18

civil enforcement and preemption sections.[13]  *See* 29 C.F.R. § 2510.3-3(a)-(c) (2010).  Because it

appears that these plans are not covered by ERISA,[14] the claims by these three plaintiffs are not

preempted.[15]

The plaintiffs also argue that the Trustee represents numerous individual, governmental,

and church plans that are not covered by ERISA.  (Docket No. 134 at 6.)  But the court

previously held that the Trustee's standing to pursue claims on behalf of the plans depended on

his status as an ERISA fiduciary.  (Docket No. 33 at 7-13.)  Generally, when a bankrupt debtor

has misappropriated funds held in trust, the bankruptcy trustee lacks standing to bring claims

against third parties for harm to the beneficiaries of the trust.  *Stevenson v. J.C. Bradford & Co.*

*(In re Cannon)*, 277 F.3d 838, 855 (6th Cir. 2002).  This is because any funds recovered will go

to the beneficiaries, and not to the bankruptcy estate.  *Id.*  But this court held that *Cannon* was

not squarely applicable and that the Trustee had standing to pursue his claims because the

Trustee is an ERISA fiduciary.  (Docket No. 33 at 8-13.)  To the extent that the Trustee purports

to represent non-ERISA plans, he has no standing to pursue these claims.

In sum, the court finds that the majority of the plaintiffs' negligence claims are

---

[13] The court assumes that Stokes and 1Point nevertheless owed these plaintiffs a fiduciary
duty.

[14] Although the court accepts the plaintiffs' representation that these are non-ERISA
plans, the defendant is free to argue in future proceedings that ERISA actually does apply to
these plans.

[15] The plaintiffs argue that it is illogical for these plaintiffs' claims to survive, while
other, identical claims are preempted.  (Docket No. 134 at 6.)  But this is a wholly unremarkable
result.  For example, the EFS plaintiffs could each bring state-law claims against Stokes for
breach of fiduciary duty.  These claims would be identical, in that they would be based on the
same set of transfers and misappropriations by Stokes.  But, as here, the claims brought by
ERISA plaintiffs would be preempted, while the claims by non-ERISA plaintiffs would not.

preempted for the same reasons that the Trustee's previous aiding-and-abetting claim was preempted. The claims will be dismissed, except for the claims of plaintiffs Niedermeyer, Allen, and Simpson.[16]

## III.   TCPA Claims

The plaintiffs have also asserted claims under the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq.*

The TCPA "provides additional, supplementary state law remedies to consumers." *Morrison v. Allen*, No. M2007-01244-COA-R3-CV, 2009 Tenn. App. LEXIS 298, at *28 (Tenn. Ct. App. Jan. 30, 2009) (quotation marks omitted). Tenn. Code Ann. § 47-18-104(a) states that "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices." Subsection (b) of the statute, "[w]ithout limiting the scope of subsection (a)," lists a number of specific activities that are "unfair or deceptive." Most of these activities deal with misrepresenting goods, and none of them applies to this case.

The defendant argues that, because none of the subsection (b) examples are at issue here, the TCPA is inapplicable. (Docket No. 107 at 19-20.) This is incorrect. "If a particular act or

---

[16] The Trustee filed his initial complaint on August 20, 2007. The defendant argues that the three-year statute of limitations in Tenn. Code. Ann. § 28-3-105 applies to bar claims that accrued before August 20, 2004. (Docket No. 107 at 17.) While this may be true, Tennessee applies the "discovery rule" to tort actions, which means that "the cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered. *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680 (Tenn. 1990). Nothing at this stage of the litigation suggests that the plaintiffs were aware of Stokes' fraud until 1Point filed bankruptcy in September 2006. Thus, the claims are not time-barred.

The defendant does not argue that EFS' complaint does not relate back to the Trustee's initial complaint. (*See* Docket No. 109 at 6-7.)

practice is not contained within [subsection (b)'s] non-exclusive list, 'the definition[s] of [unfair and deceptive] are left to the courts on a case by case basis.'" *Wolfe v. MBNA Am. Bank*, 485 F. Supp. 2d 874, 890 (W.D. Tenn. 2007) (citing *Ganzevoort v. Russell*, 949 S.W.2d 293, 300 (Tenn. 1997)) (last two alterations in original). Thus, in *Wolfe*, the court found that the defendant bank's failure to make reasonable efforts to verify a credit card applicant's identity "clearly [fell] within the scope of 'unfair' acts or practices under the TCPA." *Id.* This accords with the Tennessee Court of Appeals' recent statement that "[n]egligent conduct can constitute an unfair or deceptive act." *Morrison*, 2009 Tenn. App. LEXIS 298 at *30. Clearly, knowing or intentional conduct can constitute an unfair act as well.

But, for the majority of the plaintiffs, the TCPA claims fail for the same reasons that their negligence claims fail. First, to the extent that the claims are based on Regions' negligent conduct, they are foreclosed by the UFA. The TCPA contains an exemption for "[a]cts or transactions . . . specifically authorized under the laws [of Tennessee]." Tenn. Code Ann. § 47-18-111(a)(1). The UFA specifically "authorize[s]" a bank to effectuate a fiduciary depositor's transfers, "without being liable to the principal," as long as the bank is acting in good faith and without actual knowledge of the fiduciary's breach of duty. *Id.* §§ 35-2-107, 35-2-109. This is true even if the bank has acted negligently.

Second, to the extent that the TCPA claims are based on the defendant's bad faith or actual knowledge of Stokes and 1Point's scheme, they are preempted by ERISA for the same reason the negligence claims are preempted: the claims are derivative of the plans' ERISA claims because the requisite "unfair or deceptive" conduct depends on the defendant's knowledge of Stokes' breach.

21

Thus, except for the claims of plaintiffs Niedermeyer, Allen, and Simpson, whose plans are not covered by Title I of ERISA, the plaintiffs' TCPA claims will be dismissed.[17]

## IV.    Unjust Enrichment Claims

Finally, the plaintiffs have asserted unjust enrichment claims. The defendant argues that these are duplicative of the Trustee's equitable ERISA claim, which the court previously dismissed. (Docket No. 107 at 22.)

In Tennessee, the elements of an unjust enrichment claim are: "1) [a] benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quotation marks omitted) (alteration in original). The plaintiffs allege that Regions was unjustly enriched because it "received a large number of fees as a result of its negligent and improper business relationship with 1Point Solution and Barry Stokes." (Docket No. 99 ¶ 76; Docket No. 100 ¶ 110.)

The court previously dismissed the Trustee's 29 U.S.C. § 1132(a)(3) claim, which sought equitable relief against Regions. In doing so, the court stated:

_____

[17] The TCPA contains a one-year statute of limitations and five-year statute of repose. Tenn. Code Ann. 47-18-110. The defendant argues that the one-year period bars claims regarding activity that occurred more than one year before the Trustee filed his initial complaint on August 20, 2007. (Docket No. 107 at 21-22.) But, as with the negligence claims, the "discovery rule" applies, *Schmank v. Sonic Auto., Inc.*, 2008 Tenn. App. LEXIS 291, at *6 (Tenn. Ct. App. May 16, 2008), and nothing at this stage suggests that the plaintiffs discovered their TCPA claims before 1Point's bankruptcy filing in September 2006.

The EFS plaintiffs concede that the five-year statute of repose bars recovery for Regions' conduct before August 2002. (Docket No. 117 at 21.)

22

> In *Great-West Life & Annuity Insurance Co. v. Knudson*, the
> Supreme Court held that the remedy of restitution is only
> equitable, and thus recoverable under § 1132(a)(3), where the
> plaintiff seeks "not to impose personal liability on the defendant,
> but to restore to the plaintiff particular funds or property in the
> defendant's possession," and rejected the plaintiffs' claim because
> it sought funds that were not in the defendants' possession. 534
> U.S. 204, 213-14 (2002) . . . .
>
> The Trustee further argues, in his opposition to
> Regions/AmSouth's motion to dismiss, that he may be entitled to
> disgorgement of fees and charges that Regions/AmSouth withdrew
> from the accounts. Although restitution and disgorgement may, at
> times, constitute equitable remedies recoverable under §
> 1132(a)(3), that is not the case here. There is no allegation that the
> funds the Trustee seeks to recover are specifically identifiable and
> held in the defendants' possession.

(Docket No. 33 at 26-27.)

The current unjust enrichment claims seek disgorgement of Regions' fees, which is the
exact remedy sought by the Trustee's § 1132(a)(3) claim. "[A]ny state-law cause of action that
duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the
clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."
*Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004). Accordingly, "state law claims against
non-fiduciaries may be preempted where they merely reframe an ERISA claim as a state law
cause of action." (Docket No. 33 at 29 (citing *Briscoe v. Fine*, 444 F.3d 478, 499 (6th Cir.
2006).) The unjust enrichment claims appear to be a reframing of the previously dismissed
ERISA claim.

In addition, the inequitable circumstances forming the basis of the claim are the
allegations that Regions benefitted by ignoring Stokes' and 1Point's wrongdoing. As with the
negligence and TCPA claims, the unjust enrichment claims are preempted to the extent that they

23

depend on Regions' knowledge of Stokes' and 1Point's breach of fiduciary duty.

Accordingly, except for the claims of plaintiffs Niedermeyer, Allen, and Simpson, whose plans are not covered by Title I of ERISA, the plaintiffs' unjust enrichment claims will be dismissed.

## V.    Motion to Strike

Because some claims remain, the court will address the plaintiffs' Motion to Strike. The plaintiffs argue that, in asserting the affirmative defense of comparative negligence, the defendant has failed to meet the pleading requirements of the Federal Rules of Civil Procedure.

The Answer to EFS' Second Amended Complaint contains several statements regarding comparative fault. In its affirmative defenses section, Regions alleges:

> 1. . . . [The plaintiffs'] damages were caused in whole or in part by the comparative fault of one or more of the following: [A list of the plaintiffs and individuals and entities who acted on behalf of the relevant plans]. . . .

> 4. Plaintiffs' fault is comparatively greater than any fault of Regions. . . .

> 6. . . . Regions is entitled to contribution, indemnification or a reduction in the award by the percentage of fault assigned to any other parties, persons or entities whose negligence or other acts proximately contributed to the claimed damages.

> 7. . . . [The plaintiffs'] damages are the result of their own acts or omissions or those of their respective fiduciaries, including without limitation their failure and the failure of their trustees and other fiduciaries to perform basic due diligence prior to retaining Barry Stokes and 1Point, and their failure to supervise and control Barry Stokes and 1Point, and are not the result of any act or omission by Regions.

(Docket No. 105 at 10-12.)

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading an insufficient defense." Rule 8 governs the level of detail required in parties' pleadings. Rule 8(a)(2) requires a plaintiff's complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Similarly, Rule 8(b), which is titled "Defenses; Admissions and Denials," requires a defendant's answer to "state in short and plain terms its defenses to each claim asserted against it." *Id.* 8(b)(1)(A). Rule 8(c), titled "Affirmative Defenses," states that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense," including "contributory negligence." *Id.* 8(c)(1). Unlike subsections (a) and (b), subsection (c) does not include any language requiring the party to state anything in "short and plain" terms.

The recent Supreme Court cases of *Iqbal* and *Twombly* held that "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). Thus, "mere conclusory statements" are not enough to state a cause of action. *Id.* The plaintiffs argue that the standard enunciated in *Iqbal* and *Twombly* applies equally to affirmative defenses, making conclusory statements of comparative negligence insufficient to raise such a defense. (Docket No. 113 at 3.)

Some district courts have agreed with the plaintiffs' view. *E.g.*, *Tracy v. NVR, Inc.*, No. 04-CV-6541L, 2009 U.S. Dist. LEXIS 90778, at *27-30 (W.D.N.Y. Sept. 30, 2009) (striking affirmative defenses that were pleaded "in simple conclusory terms"); *United States v. Quadrini*, No.: 2:07-CV-13227, 2007 U.S. Dist. LEXIS 89722, at *11-12 (E.D. Mich. Dec. 6, 2007) ("Like the plaintiff, a defendant also must plead sufficient facts to demonstrate a plausible affirmative defense . . . ."); *Home Mgmt. Solutions, Inc. v. Prescient, Inc.*, 2007 U.S. Dist. LEXIS 61608, at

25

*4-5, 9-10 (S.D. Fla. Aug. 21, 2007) (holding that affirmative defenses "are subject to the general pleading requirements of Rule 8(a)").  Other courts have reached the opposite conclusion.  *E.g.*, *First Nat'l Ins. Co. of Am. v. Camps Servs.*, No. 08-cv-12805, 2009 U.S. Dist. LEXIS 149, at *4-5 (E.D. Mich. Jan. 5, 2009) ("*Twombly*'s analysis of the 'short and plain statement' requirement of Rule 8(a) is inapplicable to this motion under Rule 8(c)."); *Westbrook v. Paragon Sys.*, 2007 U.S. Dist. LEXIS 88490, at *2 (S.D. Ala. Nov. 29, 2007) (holding that *Twombly* did not extend to Rule 8(b) or (c)).

This court agrees with the latter view – that *Twombly* and *Iqbal* did not change the pleading standard for affirmative defenses.  On its face, *Twombly* applies only to complaints and to Rule 8(a)(2), because the Court was interpreting that subsection's requirement of "'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Twombly*, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)(2)).  The opinion does not mention affirmative defenses or any other subsection of Rule 8.  *Iqbal* also focused exclusively on the pleading burden that applies to plaintiffs' complaints.  *See* 129 S. Ct. at 1949-54.

Although Rule 8(b) does require a defendant to state its defenses "in short and plain terms," which is similar to the language in Rule 8(a), the Sixth Circuit has explicitly stated that "Rule 8(b) does not apply when a defendant asserts an affirmative defense."  *Pollock v. Marshall*, 845 F.2d 656, 657 n.1 (6th Cir. 1988).  *But see Montgomery v. Wyeth*, 580 F.3d 455, 467-68 (6th Cir. 2009) (implying that the Rule 8(b)(1) standard applies to a statute-of-repose defense).

Under Sixth Circuit case law, a defendant asserting an affirmative defense is not required to plead specific supporting facts.  Instead, "'[a]n affirmative defense may be pleaded in general

26

terms and will be held to be sufficient . . . as long as it gives plaintiff fair notice of the nature of

the defense.'" *Lawrence v. Chabot*, 182 Fed. Appx. 442, 456 (6th Cir. 2006) (quoting 5 Wright

& Miller, Federal Practice and Procedure § 1274). Thus, in *Lawrence*, it was sufficient for the

defendants to plead merely that they were "entitled to qualified immunity for all activities

complained of in this complaint." *Id.* The court relied on its earlier decision in *Davis v. Sun Oil

Co.*, 148 F.3d 606 (6th Cir. 1998), in which it refused to strike an affirmative defense stating that

"Plaintiffs' claims are barred by the doctrine of res judicata." 182 Fed. Appx. at 456 (quoting

*Davis*, 148 F.3d at 612).

More recently, in *Montgomery*, the Sixth Circuit held that the defendant properly pleaded

a statute-of-repose defense when its answer stated that "'Plaintiff's causes of action are barred in

whole or in part by the applicable statutes of limitations and repose,'" and when its affirmative

defenses included "'defenses of the Tennessee Products Liability Act of 1978, as codified in

[Tenn. Code Ann.] §§ 29-28-101 through 108.'" 580 F.3d at 467 (alteration in original). This

was enough to meet Rule 8's requirements. *Id.* Notably, the Sixth Circuit's decision in

*Montgomery* post-dated *Twombly* and *Iqbal*.

Thus, the Sixth Circuit has consistently used "fair notice" as the standard for whether a

defendant has sufficiently pleaded an affirmative defense. *Id.*; *Lawrence*, 182 Fed. Appx. at 456.

*Twombly* and *Iqbal* did not change this. This court has little trouble finding that Regions'

Answer, which lists the people who were allegedly comparatively negligent and the specific

duties of care that they violated, gives plaintiffs sufficient notice of the nature of the affirmative

defense. *See Del-Nat Tire Corp. v. A to Z Tire & Battery, Inc.*, No.09-2457, 2009 U.S. Dist.

LEXIS 114337, at *5-6 (W.D. Tenn. Nov. 23, 2009) (denying motion to strike because the

27

defendant's affirmative defense of credits and offsets listed five discrete sources for the credits, which gave the plaintiff fair notice), *report and recommendation accepted by* 2009 U.S. Dist. LEXIS 114332 (W.D. Tenn. Dec. 8, 2009).

Because the defendant has met its burden for pleading the affirmative defense of comparative negligence, the court will deny the plaintiffs' Motion to Strike.

## CONCLUSION

For all of the reasons discussed above, the defendants' Motions for Judgment on the Pleadings will be granted in part and denied in part. The Trustee's complaint will be dismissed in its entirety. The EFS plaintiffs' claims will also be dismissed, except for the claims of plaintiffs Niedermeyer, Allen, and Simpson, whose 401(k) and retirement plans are not covered by Title I of ERISA. Finally, the court will deny the plaintiffs' Motion to Strike.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge